ROBERT C. SCHUBERT (S.B.N. 62684)
rschubert@sjk.law
WILLEM F. JONCKHEER (S.B.N. 178748)
wjonckheer@sjk.law
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, California  94111
Telephone:     (415) 788-4220
Facsimile:     (415) 788-0161

ALFRED G. YATES
yateslaw@aol.com
**LAW OFFICE OF ALFRED G. YATES, JR. P.C.**
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, Pennsylvania 15234
Telephone:     (412) 391-5164
Facsimile:     (412) 471-1033

*Counsel for Derivative Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES R. BLACKBURN, derivatively, on behalf of PG&E CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> RICHARD A. MESERVE, ROSENDO G. PARRA, FORREST E. MILLER, BARBARA L. RAMBO, LEWIS CHEW, FRED J. FOWLER, RICHARD C. KELLY, ERIC D. MULLINS, ANNE SHEN SMITH, GEISHA WILLIAMS, PATRICK HOGAN, JASON WELLS, ANTHONY EARLEY, JR. and ROGER H. KIMMEL, <br><br> Defendants, <br><br> and <br><br> PG&E CORPORATION, <br><br> Nominal Defendant. | **Case No.** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACHES OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS** <br><br> <u>JURY TRIAL DEMANDED</u> |

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Verified Shareholder Derivative Complaint**

Plaintiff, by his undersigned attorneys, for his verified shareholder derivative complaint, alleges the following upon personal knowledge as to his own acts, and upon information and belief as to all other matters, upon the investigation of his counsel. This investigation included the review of information relating to the relevant time period obtained from public sources – including, *inter alia*, U.S. Securities and Exchange Commission filings, court filings, public reports, regulatory proceedings and filings, press releases, news articles, and other media reports.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action on behalf of nominal defendant PG&E Corporation ("PG&E" or the "Company"), against certain of its current and former officers and directors, seeking to remedy violations of state law, including breaches of fiduciary duties, unjust enrichment, and waste of corporate assets. PG&E is a publicly-traded corporation incorporated under the laws of the State of California and is headquartered in San Francisco, California.

2.     PG&E is an energy-based holding company for Pacific Gas and Electric Company, a utility company through which PG&E sells and delivers electricity and natural gas to more than 16 million people throughout approximately 70,000 square miles in Northern and Central California, making it one of the largest combined natural gas and electric utilities in the United States.

3.     Founded in 1852 as the San Francisco Gas Company, PG&E has proclaimed as its employee pledge: "I always put safety first. I look for and act to resolve unsafe situations. I help and encourage others to act safely." Yet, PG&E's officers and directors' conduct and behavior has fallen far short of this stated promise, with tragic consequences for Californians, and enormous damage to PG&E and its shareholders.

4.     PG&E's safety record came into sharp focus in the wake of the infamous pipeline disaster in San Bruno, California on September 9, 2010, when a portion of the Company's underground natural gas transmission system ruptured, causing a massive explosion and fire which ultimately claimed eight lives, injured dozens, and destroyed nearly forty homes.

5.     Investigative and regulatory reports issued in the wake of the September 2010 disaster revealed that, for decades, PG&E's corporate culture emphasized short-term profits at the

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 expense of long-term safety. The Company's officers and directors created and nurtured this

2 mantra, and as a result, it permeated nearly all PG&E corporate layers and departments.

3       6.     For instance, the Company's officers and directors mismanaged PG&E in bad faith

4 for years by deferring monies earmarked for maintenance, safety tests, and safety upgrades for

5 other purposes, including lavish bonuses and compensation to management. The Company's

6 officers and directors deliberately ignored internal budgets and knowingly allowed core operations

7 to remain under-maintained and ripe for a catastrophic incident.

8       7.     PG&E was ultimately indicted for the pipeline disaster, and in August 2016, after a

9 criminal trial before Hon. Thelton E. Henderson in this Court, PG&E was convicted by a jury on

10 six counts for willful violations of law, and sentenced to a maximum fine in January 2017 and five

11 years of probation. *U.S. v. Pacific Gas and Electric Co.*, No. 14-cr-175 (N.D. Cal.).

12       8.     Unfortunately, defendants' breaches as exposed in that trial extended to their abject

13 failure to ensure that PG&E's electrical power and distribution systems complied with state

14 regulations and safety protocols designed to prevent power lines from failing and sparking

15 wildfires in California. These failures led to two massive wildfire episodes in 2017 and 2018 that

16 devasted parts of Northern California, exposing the Company to yet more huge damage claims.

17       9.     As alleged herein, the 2017 fires impacted counties north of San Francisco Bay (the

18 "North Bay Fires"), and the 2018 fires severely impacted areas surrounding Paradise, California

19 (the "Camp Fire"). Together, the North Bay and Camp Fires burned hundreds of square miles,

20 destroyed thousands of homes, and caused dozens of fatalities. In both instances, PG&E was

21 responsible for creating dangerous conditions leading up to the fires.

22       10.    Under the California Public Resources Code Section and other rules and

23 regulations, PG&E was required to maintain clearances of its electrical lines and related power

24 infrastructure from vegetation to avoid fire risk.

25       11.    The defendants named herein systematically failed in their fiduciary obligations to

26 ensure that PG&E could deliver power services safely and comply with applicable laws, rules,

27 regulations, and standard practices. Their failure has directly harmed PG&E and its shareholders

28 by causing PG&E to incur enormous liabilities.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Verified Shareholder Derivative Complaint**       3

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

12. Plaintiff, on behalf of PG&E, seeks monetary damages from the defendants who disregarded their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by PG&E and its shareholders. Dramatic corporate governance and procedural changes are also necessary to ensure that PG&E prioritizes safety in all its operations.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

14. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction by District courts in this District permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in the Northern District Court of California in accordance with 28 U.S.C. § 1391 because: (a) PG&E maintains its principal executive offices in the Northern District of California; (b) one or more of the defendants either resides in or maintains offices in the Northern District of California; and (c) a substantial portion of the acts and transactions giving rise to the violations of law alleged herein occurred in the Northern District of California.

16. Intradistrict Assignment: A substantial portion of the acts and transactions giving rise to the violations of law alleged herein occurred in the City and County of San Francisco and as such, this action is properly assigned to the San Francisco division of this Court.

## PARTIES

**Plaintiff Blackburn**

17. Plaintiff Charles R. Blackburn is a current PG&E shareholder. Plaintiff has continuously owned PG&E common stock since 2009. Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant PG&E**

18.     Nominal Defendant PG&E is a California corporation with its principal executive offices located at 77 Beale Street, San Francisco, California. PG&E is a citizen of the State of California. PG&E's shares are publicly traded on the New York Stock Exchange under the stock symbol "PCG." As of January 2019, approximately 518 million PG&E shares were issued and outstanding. PG&E has a current market capitalization of approximately $6 billion.

**Individual Defendants**

19.     Defendant Richard A. Meserve has served as a member of the Company's Board since December 2006. At relevant times Meserve served as the Chair of PG&E's Safety and Nuclear Oversight Committee and as a member of the Company's Executive Committee, Compliance and Public Policy Committee and Nominating and Governance Committee. For fiscal year 2017, Meserve received $275,085 in fees, stock awards and other compensation. On information and belief, Meserve is a citizen of Washington, D.C.

20.     Defendant Rosendo G. Parra has served as a member of the Company's Board since September 2009. At relevant times Parra served as a member of PG&E's Finance Committee, Nominating and Corporate Governance Committee, and Safety and Nuclear Oversight Committee. For fiscal year 2017, Parra received $261,085 in fees, stock awards and other compensation. On information and belief, Parra is a citizen of Texas.

21.     Defendant Forrest E. Miller has served as a member of the Company's Board since February 2009. At relevant times Miller served as the Chair of the Company's Audit Committee. Miller is also a member of the Company's Executive Committee and PG&E's Compensation Committee. For fiscal year 2017, Miller received $318,904 in fees, stock awards and other compensation. On information and belief, Miller is a citizen of California.

22.     Defendant Barbara L. Rambo has served as a member of the Company's Board since January 2005. At relevant times Rambo served as the Chair of PG&E's Finance Committee. Rambo also served as a member of the Company's Executive Committee, as well as a member of PG&E's Compensation Committee and Nominating and Governance Committee. For fiscal year

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

2017, Rambo received $270,085 in fees, stock awards and other compensation. On information and belief, Rambo is a citizen of California.

23.    Defendant Lewis Chew has served as a member of the Company's Board since September 2009. At relevant times Chew served as a member of the Company's Audit Committee and Executive Committee, and as Chair of PG&E's Compliance and Public Policy Committee. For fiscal year 2017, Chew received $293,630 in fees, stock awards and other compensation. On information and belief, Chew is a citizen of California.

24.    Defendant Fred J. Fowler has served as a member of the Company's Board since March 2012. At relevant times Fowler served as a member of PG&E's Finance Committee and Safety and Nuclear Oversight Committee, and also served on PG&E's Compliance and Public Policy Committee. For fiscal year 2017, Fowler received $277,835 in fees, stock awards and other compensation. On information and belief, Fowler is a citizen of Texas.

25.    Defendant Richard C. Kelly has served as a member of the Company's Board since June 2013. At relevant times Kelly served as a member of the Company's Audit Committee and PG&E's Safety and Nuclear Oversight Committee. For fiscal year 2017, Kelly received $284,752 in fees, stock awards and other compensation. On information and belief, Kelly is a citizen of Minnesota.

26.    Defendant Eric D. Mullins has served as a member of the Company's Board since 2016. At relevant times Mullins served on the Audit Committee and the Safety and Nuclear Oversight Committee. For fiscal year 2017, Mullins received $260,085 in fees, stock awards and other compensation. On information and belief, Mullins is a citizen of Texas.

27.    Defendant Anne Shen Smith has served as a member of the Company's Board since 2015. At relevant times Smith served on the Compliance, Finance, and Safety and Nuclear Oversight Committees. For fiscal year 2017, Smith received $272,585 in fees, stock awards and other compensation. On information and belief, Smith is a citizen of California.

28.    Defendant Geisha Williams served as Chief Executive Officer and President of PG&E from March 2017 until January 2019, when she resigned. For fiscal year 2017, Williams

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  received $8,597,220 in fees, stock awards and other compensation. On information and belief,

2  Williams is a citizen of California.

3      29.  Defendant Patrick Hogan has served as the Company's Senior Vice President of

4  Electric Operations and Vice President of Electric Strategy & Asset Management since 2013. On

5  information and belief, Hogan is a citizen of California.

6      30.  Defendant Jason Wells has served as the Company's Senior Vice President and

7  Chief Financial Officer since 2016. For fiscal year 2017, Wells received $3,108,134 in fees, stock

8  awards and other compensation. On information and belief, Wells is a citizen of California.

9      31.  Defendant Anthony F. Earley, Jr. served as a member of the Company's Board

10  from 2011 through 2017, including as PG&E's Chief Executive Officer, President, and Chairman.

11  For fiscal year 2017, Earley received $6,012,239 in fees, stock awards and other compensation. On

12  information and belief, Earley is a citizen of California.

13      32.  Defendant Roger H. Kimmel served as a member of the Company's Board from

14  January 2009 until he resigned in January 2019. Kimmel served as a member of PG&E's Finance

15  Committee, Nominating and Governance Committee, and Compliance and Public Policy

16  Committee. For fiscal year 2017, Kimmel received $265,965 in fees, stock awards and other

17  compensation. On information and belief, Kimmel is a citizen of California.

18      33.  These defendants are sometimes collectively referred to herein as the "Individual

19  Defendants." Each of these defendants owe or owed the Company fiduciary duties of due care,

20  good faith, candor, and loyalty.

21  **DUTIES OF THE INDIVIDUAL DEFENDANTS**

22      34.  By reason of their positions as officers, directors, and fiduciaries of PG&E and

23  because of their ability and authority to control its affairs, each of the Individual Defendants owe

24  or owed PG&E and its shareholders fiduciary obligations of good faith, loyalty, candor, and due

25  care and were and are required to use their utmost abilities to control and manage PG&E in a fair,

26  just, honest, and equitable manner.

27      35.  The Individual Defendants were and are required to act in furtherance of the best

28  interests of PG&E and its shareholders so as to benefit all shareholders equally and not in

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

furtherance of their personal interests or benefits. Each director and officer of the Company owed and owes to PG&E and its shareholders the fiduciary duty to exercise good faith and diligence in the administration and affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did exercise control over the wrongful acts complained of herein.

37.     At all material times, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PG&E, and was at all times acting within the course and scope of said agency.

38.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of PG&E.

39.     By virtue of their duties, the Individual Defendants were required to: (a) manage, conduct, supervise, and direct the business affairs of PG&E in accordance with applicable state and federal law and regulatory agencies; (b) neither violate nor permit any officer, director, or employee of PG&E to violate applicable federal and state laws, rules, regulations, and requirements; (c) establish and maintain accurate books and records of the business and affairs of PG&E and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said books and records; (d) maintain and implement an adequate and functioning system of internal controls and protocols; (e) remain informed as to the status of PG&E's operations; (f) when put on notice of imprudent or unsound business practices or operations, exercise good faith and diligence in taking appropriate remedial action to correct the misconduct and prevent its reoccurrence; and (g) preserve and enhance PG&E's reputation as befits a publicly traded corporation.

40.     Certain of the Individual Defendants assumed additional fiduciary duties in connection with their service on various Board committees of PG&E duties which they were required to exercise with loyalty and good faith.

41.   PG&E also adopted a Code of Business Conduct and Ethics for Directors on December 20, 2006, which was subsequently amended by the Board on December 16, 2009, December 21, 2011, June 16, 2015, and May 23, 2018. At all relevant times, the Code of Business Conduct and Ethics for Directors explained that PG&E "expect[ed] every director to read and understand this Code and its application to the performance of his or her responsibilities" and that PG&E would "hold each of our directors accountable for adherence to this Code." Among the "values" specifically adopted by PG&E is the following: "We are accountable for our own actions: these include safety, protecting the environment, and supporting our communities."

42.   PG&E's operative Code of Conduct for Employees during relevant times similarly included the same stated "values" and further instructs employees to "[m]aintain an absolute commitment to safety for ourselves and others" and to "[t]ake accountability for actions, decisions and results vs. blaming."   The "Compliance Standards" section of the Code of Conduct for Employees explains that "PG&E is responsible for complying with thousands of compliance requirements issued by nearly 200 governmental bodies. Each of us is responsible for knowing and complying with the laws and regulations."

## FACTS

### A.   Company Background and Regulatory Framework.

43.   PG&E operates facilities that generate electricity and deliver electricity and gas throughout parts of California. These activities are potentially hazardous to the environment and the public, and require PG&E to exercise extreme care and caution in its operations. A power line can start a fire if it breaks in the wind and lands on flammable vegetation. It can start a fire when a tree or a branch falls across it, or when equipment fails due to age or poor maintenance.

44.   To ensure public safety in the face of these risks, California imposes certain requirements upon persons (like PG&E) that operate "electrical transmission or distribution" lines in the state. Among those requirements are that the utility must keep electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

45.   California Public Resources Code Section 4292 requires PG&E to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester,

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1   line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than

2   10 feet in each direction from the outer circumference of such pole or tower."

3       46.    In addition, California Public Resources Code Section 4293 requires that "dead

4   trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof

5   that are leaning toward the line which may contact the line from the side or may fall on the line

6   shall be felled, cut, or trimmed so as to remove such hazard."

7       47.    Furthermore, pursuant to California Public Utilities Code Section 451, "Every

8   public utility shall furnish and maintain such adequate, efficient, just, and reasonable service,

9   instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section

10   54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of

11   its patrons, employees, and the public."

12       48.    California Health & Safety Code Section 13007 further provides that "Any person

13   who personally or through another willfully, negligently, or in violation of law, sets fire to, allows

14   fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another,

15   whether privately or publicly owned, is liable to the owner of such property for any damages to the

16   property caused by the fire."

17       49.    PG&E's primary regulator is the California Public Utilities Commission (the

18   "CPUC"). The CPUC promulgates safety regulations for public utilities, among its other oversight

19   responsibilities. Consistent with the foregoing statutes, the CPUC issues rules regarding vegetation

20   management. Pursuant to CPUC General Order 95, Rule 35, PG&E is required "to establish

21   necessary and reasonable clearances" between overhead conductors and nearby vegetation, with

22   certain "minimum clearances" set forth by the CPUC.

23       **B.    PG&E's Poor Track Record Regarding Wildfires.**

24       50.    Notwithstanding its clear obligations under applicable state statutes and regulatory

25   directives to proactively address fire risk, PG&E has a recent history of failing to manage

26   vegetation issues, even prior to the North Bay Fires and Camp Fire.

27       51.    According to data released by the CPUC, PG&E equipment caused 1,486

28   vegetation fires between June 10, 2014 and December 29, 2017.

Schubert Jonckheer & Kolbe LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

52.     In this regard, PG&E was deemed responsible for the Butte Fire, a rapidly moving wildfire that started on September 9, 2015 in Amador County. The Butte Fire started when a tree came into contact with a power line and quickly grew. The fire spread into Calaveras County and eventually more than doubled in size. Then-governor Jerry Brown later declared a state of emergency in Amador and Calaveras counties.

53.     An investigation conducted by the California Department of Forestry and Fire Protection ("Cal Fire") found PG&E responsible for the 2015 Butte Fire, one of the most destructive wildfires in State history at the time. The investigation determined that the fire was sparked by a PG&E power line that came into contact with a tree, resulting in a wildfire that spread to more than 70,000 acres, killed two people and burned more than 900 structures. The Butte Fire was at that time the seventh-largest in State history. Poor tree maintenance by PG&E and its contractors led to the fire, according to the Cal Fire investigative report.

54.     However, notwithstanding the problems with power line and vegetation maintenance identified by Cal Fire following the destructive Butte Fire, in October 2017 Northern California was hit by another series of fires, with the same root causes. The North Bay Fires broke out throughout several North Bay counties during severe fire weather conditions. The North Bay Fires were the costliest group of wildfires on record, causing around $14.5 billion in damages, including $1.5 billion in fire suppression costs.

55.     On May 25, 2018, Cal Fire issued a press release describing the results of an investigation of the North Bay Fires. According to the press release:[1]

> Sacramento – After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were **caused by trees coming into contact with power lines**. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

---

[1] Unless otherwise indicated herein, all emphasis is supplied.

Verified Shareholder Derivative Complaint                                          11

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes. Below is a summary of the four completed investigations:

The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was **caused by tree branches falling onto PG&E power lines**. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was **caused by a tree falling onto PG&E power lines**. The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.

The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was **caused by a tree contacting PG&E power lines**. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.

The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. CAL FIRE has determined the fire was **caused by an Oak branch contacting PG&E power lines**. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

56.   On June 8, 2018, Cal Fire issued another press release describing the results of further investigation of the North Bay Fires. According to the press release:

Sacramento – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were **caused by electric power and distribution lines, conductors and the failure of power poles**.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The Redwood Fire, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was **caused by tree or parts of trees falling onto PG&E power lines**.

The Sulphur Fire, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was **caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground**.

The Cherokee Fire, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a **result of tree limbs coming into contact with PG&E power lines**.

The 37 Fire, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the **cause of the fire was electrical and was associated with the PG&E distribution lines in the area**.

The Blue Fire, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a **PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire**.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CAL FIRE investigators determined the Norrbom Fire was **caused by a tree falling and coming in contact with PG&E power lines**.

CAL FIRE investigators determined the Adobe Fire was **caused by a eucalyptus tree falling into a PG&E powerline**.

CAL FIRE investigators determined the Partrick Fire was **caused by an oak tree falling into PG&E powerlines**.

CAL FIRE investigators determined the Pythian Fire was **caused by a downed powerline after PG&E attempted to reenergize the line**.

CAL FIRE investigators determined the Nuns Fire was **caused by a broken top of a tree coming in contact with a power line**.

The Pocket Fire, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was **caused by the top of an oak tree breaking and coming into contact with PG&E power lines**.

The Atlas Fire, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined **a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line**.

CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires – Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas – due to evidence of alleged violations of state law.

57.     The results of Cal Fire's investigation were a clear warning sign to management and the Board that PG&E's vegetation management processes were failing. Yet even as Cal Fire's investigation of the North Bay Fires was continuing, including criminal referrals to county district attorneys, a second catastrophic wildfire episode hit Northern California in November 2018 – the Camp Fire. According to firefighter radio transmissions and media reporting, on November 8,

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County.

58.     Later that day, PG&E admitted that one of its 115-kilovolt transmission lines on Pulga Road in Butte County experienced an outage, and noted that the site was near the Camp Fire. Cal Fire has since identified Pulga Road as the Camp Fire starting point. The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. Just one day prior to the Camp Fire's ignition, PG&E had contacted a Pulga landowner regarding transmission line poles on her property that "were having problems with sparks."

59.     Investigators believe that the failure of a badly maintained steel hook holding up the high voltage line was a key cause of the fire. PG&E's apparent failure to maintain a clearance for vegetation up to 10 feet away from this transmission line violated California Public Resources Code §4293. Furthermore, PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated California Public Utilities Code Section 451. A potential second ignition point for the Camp Fire was identified by PG&E on or about November 16, 2018.

60.     The community of Concow and the town of Paradise were destroyed within the first six hours of the fire starting, losing an estimated 95 percent of their buildings. The town of Magalia also suffered substantial damage, and the community of Pulga suffered also. At least 19,000 buildings were destroyed, most of them homes, but also five public schools in Paradise, a rest home, churches, a hospital, a Christmas tree farm, a large shopping center anchored by a Safeway, several fast food chains, and numerous small businesses.

61.     As of December 13, 2018, the Butte County Sheriff's Department reported a partial death count of 51.

**C.     PG&E's Board Has Been on Notice of the Company's Woeful Safety Record.**

62.     PG&E has a long record of safety lapses spanning across its operations which were the result of disastrously ineffective oversight of risk, safety, and regulatory compliance.

63.    Each new episode provided as alleged herein provided further notice to the Board that it was failing in its duties to manage and oversee the Company's internal controls and processes, but the Board did not implement appropriate changes.

64.    For example, with respect to the San Bruno pipeline disaster, the National Transportation Safety Board ("NTSB") issued a report that blamed the explosion on PG&E's poor pipeline management, stating that the probable cause of the accident was PG&E's "inadequate quality assurance and quality control" resulting in the pipeline rupture, and an "inadequate pipeline integrity management program, which failed to detect and repair or remove the defective pipe section." PG&E was fined $1.6 billion by the CPUC after it was found negligent, and ordered to conduct a $3 million advertising campaign to apologize for its conduct.

65.    After a lengthy trial, a federal jury found PG&E guilty on August 9, 2016 of willful violations of the Natural Gas Pipeline Safety Act of 1968, 49 U.S.C. § 60123, and obstructing an agency proceeding. These charges stemmed from PG&E's inadequate record keeping and deficient pipeline "integrity management" practices uncovered in the course of the San Bruno investigation. An obstruction charge was added after investigators discovered that PG&E attempted to mislead the NTSB during its investigation.

66.    Notably, the first condition to the probation imposed by Judge Henderson was that PG&E "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum and reassured the Court, prosecutors, the public, and its shareholders that it would not engage in further criminal acts, including criminally negligent or reckless safety violations. This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike.

67.    Similarly, just two years prior to the disastrous 2017 North Bay Fires, PG&E's deficient vegetation management practices were identified as the cause of the Butte Fire, yet the very same dangerous conditions continued to exist throughout PG&E's high risk coverage areas. According to regulatory filings, PG&E has paid out $734 million in damages for the Butte Fire and estimates that it will pay out over $1 billion. Yet less than three years later, the Company will likely be liable for a much greater sum arising out of the 2017 and 2018 fires.

68. The Board's various committee charters then in effect demonstrate that the officers and directors named as defendants herein had specific responsibilities regarding risk management and oversight, which they obviously failed to fulfill at all relevant times.

69. For example, the Audit Committee was specifically responsible for monitoring PG&E's policies and procedures for regulatory compliance, and risk assessment and management, with regular reports going to management and the Company's Board. Because the responsibilities and duties of the Audit Committee are set forth in its Charter, the Audit Committee members knew of risk-management programs at the Company and were cognizant of their responsibility to oversee and manage operating risks.

70. Similarly, the Compliance and Public Policy Committee was responsible for ensuring that PG&E was in compliance with all applicable regulations and that its businesses were operating in a safe and legal manner. Because the responsibilities and duties of the Compliance Committee are set forth in its Charter, the Compliance Committee members knew of risk management programs at the Company and were cognizant of their responsibility to oversee and manage operating risks.

71. Likewise, the Safety and Nuclear Oversight Committee was responsible for risk management and operational safety, which required members, by Charter, to "review with management the principal risks related to or arising out of PG&E's Operations and Facilities (including risks that are identified through PG&E's enterprise risk management program and that are selected in consultation with this Board of Directors and its committees, as applicable), and assess the effectiveness of PG&E's programs to manage or mitigate such risks, including with respect to . . . asset management programs for PG&E's electric operations and facilities."

72. In addition, the Finance Committee was responsible for assisting the Board with regard to "the financial and investment policies, risks, and objectives" of the Company "including specific actions required to achieve those objectives."

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**DAMAGES**

73.    The Individual Defendants caused PG&E to engage in unlawful conduct. The resulting tragedies and fines for safety-related deficiencies have cost (and will continue to cost) PG&E and its shareholders billions of dollars.

74.    The Company has been exposed to enormous professional legal, expert, public relations, and consultant fees and costs incurred in connection with defending the many regulatory actions and civil lawsuits arising out of the fire disasters and other safety deficiencies and PG&E practices.

75.    In addition, PG&E has lost significant goodwill, suffered immense reputational harm, and faces growing oversight of its entire business.

76.    Furthermore, in November 2018, Hon. William H. Alsup, now presiding over the criminal action arising out of the San Bruno pipeline disaster, directed PG&E to respond to a series of questions about power line safety and wildfires after the 2018 wildfires.

77.    Judge Alsup requested information on whether any requirements in the sentence handed down in the pipeline case "might be implicated" if the reckless operation or maintenance of PG&E power lines ignited a wildfire. Judge Alsup noted that the sentence required PG&E not to engage in additional crimes.

78.    On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, the reckless operation or maintenance of PG&E power lines would constitute a crime under California law."

79.    On January 9, 2019 Judge Alsup issued an order to show cause why PG&E's conditions of probation should not be modified to require that PG&E re-inspect all of its electrical grid prior to the 2019 wildfire season, and that during the 2019 wildfire season, PG&E supply electricity only through those parts of its electrical grid that it has determined to be safe under the wind conditions then prevailing.

80.    In advance of a hearing on the matter scheduled for January 30, 2019, PG&E disclosed in a court filing that complying with all of Judge Alsup's proposals could cost the

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Verified Shareholder Derivative Complaint                                                                                    18

Company as much as $150 billion, showing the extent of PG&E's massive financial exposure arising out of the Camp Fire, and the woeful state of its management practices.

81.   In addition, PG&E has been named as a defendant in a securities class action lawsuit pending in this Court, captioned *In re PG&E Corporation Securities Litigation*, Case No. 18-cv-3509-RS, in which a class of purchasers of PG&E securities is asserting claims against PG&E seeking to recover for massive stock losses caused in the wake of revelations of PG&E's woeful safety practices and its exposure to claims.

82.   According to the plaintiffs in the securities class action, PG&E and its executives, including defendants Earley, Williams and Hogan named herein, made false and misleading statements to shareholders regarding the Company's safety practices during the period April 29, 2015 through November 15, 2018.

## DERIVATIVE ACTION ALLEGATIONS

83.   Plaintiff brings this action pursuant Rule 23.1 on behalf of PG&E to enforce the Company's claims against the Individual Defendants, which may properly be asserted by PG&E and which PG&E has failed to enforce. PG&E is named as a nominal defendant solely in a derivative capacity.

84.   The wrongs complained of herein occurred during the time in which plaintiff was a PG&E shareholder. Plaintiff continues to hold shares of PG&E. Thus, plaintiff has standing to bring this derivative action on behalf of the Company to recover damages for all of the conduct described herein.

85.   Plaintiff will fairly and adequately protect the interests of PG&E and its shareholders in enforcing the rights of PG&E against the Individual Defendants. Plaintiff's attorneys are experienced are this area of litigation and will prosecute this action diligently on behalf of PG&E. Plaintiff has no interests adverse to PG&E.

## A DEMAND ON PG&E'S BOARD IS EXCUSED FOR FUTILITY

86.   On the date that this action was filed, PG&E had 10 directors, 9 of whom are named as defendants herein. For the reasons set forth below, plaintiff has not made a demand on the Board to investigate and prosecute the wrongdoing alleged herein.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

87.  Demand is excused in this case because (a) making a demand would be a futile act as the majority of PG&E's directors (9 out of 10) are not able to conduct an independent investigation of the alleged wrongdoing and (b) the wrongful conduct of the directors is not protected by the business judgment rule. Demand is therefore excused for futility.

88.  As alleged herein, each of the 9 current directors named herein faces a substantial likelihood of non-exculpated personal liability for his or her disregard of the fiduciary duty to implement internal controls sufficient to: (a) monitor and ensure the Company complied with applicable legal obligations and requirements; (b) remain informed as to the Company's internal controls and, upon receipt of notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry and take steps to correct such conditions or practices; and (c) promote a corporate climate that adequately emphasizes safety and compliance.

89.  Since a majority of the Board (9 out of 10) engaged in the wrongdoing alleged herein, they have interests adverse to performing a fair and unbiased investigation. Each of the 9 directs has been on the Board through a series of disasters, lawsuits, convictions, and findings of an inadequate culture of safety and compliance at PG&E. Each director has failed to heed these warnings, particularly those with enhanced responsibilities due to their membership on the Audit, Compliance and Public Policy, Safety and Nuclear Oversight, and Finance Committees, as alleged herein – causing PG&E's exposure to the catastrophic 2017 and 2018 wildfires.

90.  Defendant Meserve has been on the Board since 2006, and was therefore on notice of PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the 2015 Butte Fire, among other episodes. Meserve's conscious failure to act in the face of these events exposes him to a substantial likelihood of liability for breach of fiduciary duty. In addition, Meserve's decision not to remediate PG&E's woeful safety practices and infrastructure was not a valid exercise of business judgment. Demand on Meserve is therefore excused.

91.  Defendant Parra has been on the Board since 2009, and was therefore on notice of PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the 2015 Butte Fire, among other episodes. Parra's conscious failure to act in the face of these events exposes him to a substantial likelihood of liability for breach of fiduciary duty. In addition, Parra's

1   decision not to remediate PG&E's woeful safety practices and infrastructure was not a valid

2   exercise of business judgment. Demand on Parra is therefore excused.

3       92.   Defendant <u>Miller</u> has been on the Board since 2009, and was therefore on notice of

4   PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the 2015

5   Butte Fire, among other episodes. Miller's conscious failure to act in the face of these events

6   exposes him to a substantial likelihood of liability for breach of fiduciary duty. In addition,

7   Miller's decision not to remediate PG&E's woeful safety practices and infrastructure was not a

8   valid exercise of business judgment. Demand on Miller is therefore excused.

9       93.   Defendant <u>Rambo</u> has been on the Board since 2005, and was therefore on notice of

10   PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the 2015

11   Butte Fire, among other episodes. Rambo's conscious failure to act in the face of these events

12   exposes her to a substantial likelihood of liability for breach of fiduciary duty. In addition,

13   Rambo's decision not to remediate PG&E's woeful safety practices and infrastructure was not a

14   valid exercise of business judgment. Demand on Rambo is therefore excused.

15       94.   Defendant <u>Chew</u> has been on the Board since 2009, and was therefore on notice of

16   PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the 2015

17   Butte Fire, among other episodes. Chew's conscious failure to act in the face of these events

18   exposes him to a substantial likelihood of liability for breach of fiduciary duty. In addition, Chew's

19   decision not to remediate PG&E's woeful safety practices and infrastructure was not a valid

20   exercise of business judgment. Demand on Chew is therefore excused.

21       95.   Defendant <u>Fowler</u> has been on the Board since 2012, and was therefore on notice of

22   PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the related

23   criminal proceeding, and the 2015 Butte Fire, among other episodes. Fowler's conscious failure to

24   act in the face of these events exposes him to a substantial likelihood of liability for breach of

25   fiduciary duty. In addition, Fowler's decision not to remediate PG&E's woeful safety practices and

26   infrastructure was not a valid exercise of business judgment. Demand on Fowler is therefore

27   excused.

28

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

96.    Defendant Kelly has been on the Board since 2013, and was therefore on notice of PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the related criminal proceeding, and the 2015 Butte Fire, among other episodes. Fowler's conscious failure to act in the face of these events exposes him to a substantial likelihood of liability for breach of fiduciary duty. In addition, Fowler's decision not to remediate PG&E's woeful safety practices and infrastructure was not a valid exercise of business judgment. Demand on Kelly is therefore excused.

97.    Defendant Mullins has been on the Board since 2012, and was therefore on notice of PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the related criminal proceeding, and the liabilities incurred by PG&E in 2015 Butte Fire, among other episodes. Fowler's conscious failure to act in the face of these prior events exposes him to a substantial likelihood of liability for breach of fiduciary duty. In addition, Fowler's decision not to remediate PG&E's woeful safety practices and infrastructure was not a valid exercise of business judgment. Demand on Mullins is therefore excused.

98.    Defendant Smith has been on the Board since 2015, and was therefore on notice of PG&E's egregious safety lapses, including the 2010 San Bruno pipeline disaster and the related criminal proceeding, and the 2015 Butte Fire, among other episodes. Smith's conscious failure to act in the face of these events exposes her to a substantial likelihood of liability for breach of fiduciary duty. In addition, Smith's decision not to remediate PG&E's woeful safety practices and infrastructure was not a valid exercise of business judgment. Demand on Smith is therefore excused.

99.    In addition, if the Company elects to move forward with the asserted claims against the defendants, then the Company's efforts would undercut or compromise the defense of, at least, the securities class action, among other proceedings, excusing demand.

100.    Plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

**FIRST CLAIM FOR RELIEF**

**Breach of Fiduciary Duty Against All Individual Defendants**

101.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

102.    Each Individual Defendant was a director or senior officer of PG&E, and owed to the Company fiduciary duties.

103.    By reason of their fiduciary relationships, the Individual Defendants owe or owed PG&E the highest obligation of good faith, fair dealing, loyalty, and due care. Each of the Individual Defendants violated and breached these fiduciary duties.

104.    The Individual Defendants consciously or recklessly caused or permitted PG&E to violate safety laws and regulations and aided and abetted one another in doing so. The Individual Defendants further failed to institute adequate internal controls sufficient to prevent the 2017 and 2018 wildfires, related fines and damages, and other safety-related or operational investigations. In addition, the Individual Defendants made false statements to shareholders regarding the Company's operational safety and integrity.

105.    These actions or failures to act could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106.    As a direct and proximate result, the Company has been and is being further substantially damaged by the Individual Defendants' conduct in breach of their fiduciary duties. As a result of the misconduct alleged herein, the Individual Defendants are liable to PG&E.

**SECOND CLAIM FOR RELIEF**

**Corporate Waste Against All Individual Defendants**

107.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

108.    As a result of the Individual Defendants causing or allowing PG&E to violate safety laws and regulations and failing to conduct proper supervision or institute adequate internal controls, the Individual Defendants have caused and are continuing to cause PG&E to waste its corporate assets: (a) by paying undeserved compensation to certain of its executive officers and

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    directors; and (b) incurring billions of dollars in fines, expenses, and legal settlements regarding

2    the 2017 and 2018 wildfires.

3        109.    As a direct and proximate result of the wasting PG&E's corporate assets, the

4    Individual Defendants are liable to the Company.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment Against All Individual Defendants

7        110.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

8    above, as though fully set forth herein.

9        111.    As a result of the Individual Defendants' conduct described above, the Individual

10   Defendants have been and will be unjustly enriched at the expense of the Company, in the form of

11   unjustified salaries, incentive compensation, benefits, bonuses, stock option grants, and other

12   emoluments of office, as alleged herein.

13       112.    Consequently, PG&E has been damaged by the Individual Defendants' conduct.

14       113.    Plaintiff, as a PG&E shareholder, seeks restitution from the Individual Defendants

15   and an order from this Court disgorging all profits, benefits, and other compensation obtained by

16   the Individual Defendants as a result of their wrongful conduct and breaches of fiduciary duties.

### PRAYER FOR RELIEF

18       WHEREFORE, plaintiff, on behalf of PG&E, demands judgment as follows:

19       A.    Determining that this is a proper derivative action and certifying plaintiff as an

20             appropriate representative of PG&E for said action;

21       B.    Declaring that each of the Individual Defendants breached his or her fiduciary

22             duties to the Company;

23       C.    Determining and awarding PG&E the damages it sustained as a result of the

24             violations set forth above from each of the Individual Defendants, jointly and

25             severally, together with interest thereon;

26       D.    Determining and awarding PG&E restitution from the Individual Defendants, and

27             each of them, including ordering disgorgement of all profits, benefits, and other

28             compensation obtained by said Individual Defendants;

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

E.      Directing PG&E to take all necessary actions to reform and improve its corporate

2

governance and internal procedures to comply with applicable laws and regulations

3

and to protect PG&E and its shareholders from a repeat of the damaging events

4

described herein, including the adoption of the governance improvements;

5

F.      Awarding plaintiff the costs and disbursements of this action, including reasonable

6

attorneys' fees, accountants, and experts; and

7

G.      Granting such other and further relief as the Court may deem just and proper.

8

**JURY DEMAND**

9

Plaintiff demands a trial by jury on all causes of action so triable.

10

11

Dated:  January 28, 2019

SCHUBERT JONCKHEER & KOLBE LLP

12

 */s/ Willem F. Jonckheer*

13

ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)

14

Three Embarcadero Center, Suite 1650
San Francisco, California  94111

15

Telephone:      (415) 788-4220
Facsimile:       (415) 788-0161

16

17

ALFRED G. YATES
LAW OFFICE OF ALFRED G. YATES, JR.

18

300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, Pennsylvania 15234

19

Telephone:      (412) 391-5164
Facsimile:       (412) 471-1033

20

21

*Counsel for Derivative Plaintiff*

22

23

24

25

26

27

28

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

## **VERIFICATION**

I, Charles R. Blackburn, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25 day of January, 2019.

Charles R. Blackburn